# United States Court of Appeals
### For the Eighth Circuit

_____

No. 20-1747
_____

JoAnn Chase, et al.

*Plaintiffs - Appellants*

v.

Andeavor Logistics, L.P., et al.

*Defendants - Appellees*

_____

Appeal from United States District Court
for the District of North Dakota - Western

_____

Submitted: February 18, 2021
Filed: September 13, 2021

_____

Before LOKEN, BENTON, and KELLY, Circuit Judges.

_____

LOKEN, Circuit Judge.

Andeavor Logistics L.P. and its co-defendants (collectively, "Andeavor") own and operate the High Plains Pipeline System, a 500-mile oil pipeline that transports oil from North Dakota's oil-rich Bakken region to a refinery in Mandan, North Dakota. In 1953, Andeavor's predecessor-in-interest obtained a twenty-year right-of-way from the Department of the Interior allowing the pipeline to cross lands on the

Fort Berthold Indian Reservation. The right-of-way was renewed for successive twenty-year terms in 1973 and 1995 before expiring in 2013. Despite expiration, Andeavor continues to operate the pipeline across a mixture of tribal lands and individually-owned allotments, all held in trust by the United States. In 2017, Andeavor agreed with the Mandan, Hidatsa, and Arikara Nation, known as the Three Affiliated Tribes (the "Tribe"), to renew the right-of-way over tribal lands, and to pay trespass damages for continued operation of the pipeline after expiration. Andeavor then began renewal negotiations with individual Indian landowners. Some did not agree to renewal and the talks stalled.

In October 2018, certain landowners (the "Allottees") filed this putative class action against Andeavor in the United States District Court for the Western District of Texas, seeking compensatory and punitive damages for ongoing trespass and injunctive relief requiring Andeavor to dismantle the pipeline. The case was transferred to the District of North Dakota. The district court granted Andeavor's motion to dismiss, concluding the Allottees failed to exhaust administrative remedies with the Bureau of Indian Affairs ("BIA"). The Allottees appeal. The parties raise numerous complex issues regarding the right of individual Indians to obtain trespass relief in federal court. We conclude that the case turns on issues sufficiently within the primary jurisdiction of the BIA to warrant stay, rather than dismissal, to give the BIA opportunity to take further action.

## I. Background Facts and Procedural History

Part of Andeavor's High Plains Pipeline System crosses the Fort Berthold reservation in western North Dakota, home to the Three Affiliated Tribes. Within reservation boundaries, the pipeline crosses tracts of Tribal land, individually-owned Indian lands, and jointly-owned lands, all held in trust by the BIA. The Indian Right-of-Way Act of 1948 authorizes the Secretary of the Interior to "grant rights-of-way for all purposes, subject to such conditions as he may prescribe, over and across any

lands now or hereafter held in trust by the United States for individual Indians or Indian tribes." Act of Feb. 5, 1948, Pub. L. No. 80-407, 62 Stat. 17, codified at 25 U.S.C. §§ 323-38. The Secretary may not grant a right-of-way on tribal lands without the tribe's consent but may grant a right-of-way on individual trust allotments without the landowner's consent if certain criteria apply. 25 U.S.C. § 324. The pipeline began operating in 1953 after the BIA (to which the Secretary has delegated this authority) granted Andeavor's predecessor a twenty-year right-of-way. In 1973, the agency renewed the right-of-way for another twenty years. The right-of-way expired in 1993, but in 1995, the BIA retroactively renewed it back to 1993. In June 2013, the right-of-way again expired. Andeavor has continued to operate the pipeline, presumptively trespassing on Indian lands.

Andeavor set out to negotiate right-of-way renewals to resolve its continuing trespass. At the Tribe's insistence, Andeavor refrained from negotiating with individual landowners until it completed negotiations with the Tribe. In February 2017, the Tribe and Andeavor agreed to renew the right-of-way and settle past trespass damages for Tribal land for roughly $2 million per acre. On January 30, 2018, the BIA sent Andeavor a 10-Day Show-Cause Letter stating the pipeline had been trespassing on individually-owned Indian lands since the right-of-way expired in 2013. On February 7, Andeavor informed the BIA that it was currently negotiating with individual landowners to obtain their consent for renewal. On April 10, the BIA asked the landowners to confirm that good-faith negotiations were in progress. Many did. Counsel for the Allottees requested that the BIA take no action to recover possession or seek trespass remedies while negotiations continued.

The negotiations did not bear fruit. In October 2018, the Allottees commenced this action in the Western District of Texas. The Amended Complaint alleged continuing trespass under federal common law, breach of the easement agreement, and unjust enrichment. They sought various forms of relief including compensatory and punitive damages, an accounting of profits, disgorgement, and an injunction

requiring Andeavor to cease operations, remove the pipeline, and restore lands to their original conditions, as the easement agreement and federal regulations require.

After transfer to the District of North Dakota, Andeavor moved to dismiss on numerous grounds. The district court granted the motion based on the Allottees failure to exhaust administrative remedies under the BIA regulations. Alternatively, the court held that it would require the Allottees to seek administrative remedies before obtaining judicial review even if the regulations did not require exhaustion. The court did not address Andeavor's remaining grounds for dismissal.

The Allottees raise a host of issues in challenging the district court's dismissal of their Amended Complaint. Andeavor defends the judgment on numerous grounds. We review *de novo* the grant of a Rule 12 motion to dismiss, assuming all factual allegations in the pleadings are true and viewing them in the light most favorable to the nonmoving party. Wolfchild v. Redwood Cnty., 824 F.3d 761, 767 (8th Cir.), cert. denied, 137 S. Ct. 447 (2016) (citations omitted). Dismissal is appropriate when the moving party is entitled to judgment as a matter of law. Id. (citations omitted).

## II. Failure to Exhaust Administrative Remedies

In general, the well-established doctrine of administrative exhaustion requires a party to follow prescribed procedures for obtaining administrative remedies before seeking judicial relief. See Klaudt v. United States Dep't of Interior, 990 F.2d 409, 411 (8th Cir. 1993). Pursuant to explicit rule-making authority, see 25 U.S.C. § 328, the Secretary promulgated rules governing rights-of-way over Indian lands and authorized the BIA to administer the regime. See 25 C.F.R. pt. 169. Indian land includes land held in trust by the United States for a tribe ("Tribal land") and land owned by individual Indians in trust or restricted status ("individually owned Indian land"). § 169.2.

Part 169 applies to rights-of-way for oil and gas pipelines crossing Indian land. § 169.5(a)(8).[1] Non-owners applying for a pipeline right-of-way must receive the BIA's approval and "the consent of the owners of the majority interest in the land, and the tribe for tribal land." § 169.4(a). Applicants are responsible for negotiating with tribes and individual Indian landowners. If the right-of-way crosses Tribal land, the tribe can impose conditions or restrictions as it sees fit. § 169.107(a). Tribes generally may negotiate for any amount of compensation without interference from the BIA; the agency will provide a valuation analysis upon the tribe's request. § 169.110. For rights-of-way across individually-owned Indian land, an applicant must receive consent from the owners of the majority interest in each affected tract unless the BIA grants a right-of-way without individual landowner consent because specific criteria apply. § 169.107(b)(1)(i)-(iv); see 25 U.S.C. § 324. Upon request, the BIA will identify owners subject to the proposed right-of-way and may assist in contacting owners and facilitating negotiations. 25 C.F.R. § 169.106. Payments to individual landowners generally must be at least fair market value, as determined by a mandatory valuation. § 169.112.

Part 169 provides procedures for grantee violations of a right-of-way, continued use after it expires, and use of Indian land without approval. 25 C.F.R. pt. 169, subpt. F. Unauthorized use includes "accidental, willful, and/or incidental trespass." § 169.401. Trespass is not defined. Section 169.410 specifically addresses grantee holdover situations:

---

[1]An earlier Act passed in 1904 authorizes the Secretary to grant easements lasting up to twenty years for oil and gas pipelines crossing tribal lands or individually-owned trust lands. See 25 U.S.C. § 321. The 1948 Act did not repeal the 1904 Act. See Blackfeet Indian Tribe v. Mont. Power Co., 838 F.2d 1055, 1058-59 (9th Cir. 1988); see also 25 U.S.C. § 326. The parties agree that the 1948 Act and its implementing regulations under Part 169 govern this dispute.

If a grantee remains in possession after the expiration, termination, or cancellation of a right-of-way, and is not accessing the land to perform reclamation or other remaining grant obligations, [BIA] may treat the unauthorized possession as a trespass under applicable law and will communicate with the Indian landowners in making the determination whether to treat the unauthorized possession as a trespass. Unless the parties have notified [BIA] in writing that they are engaged in good faith negotiations to renew or obtain a new right-of-way, [BIA] may take action to recover possession on behalf of the Indian landowners, and pursue any additional remedies available under applicable law, such as a forcible entry and detainer action. The holdover time will be charged against the new term.

The district court noted that in Klaudt, which involved nonpayment of tribal taxes for cattle grazing, we held that the "clearly detailed administrative process and remedies" in 25 C.F.R. Part 2 "must be followed before seeking relief in the court system." 990 F.2d at 411. Here, the district court concluded, the Allottees did not exhaust these mandatory procedures by appealing the grant of the 1993 easement.[2] "As to the alleged holdover situation," the court ruled, "the BIA is apparently conducting its investigation [and] has not made a final determination."

The Allottees argue the district court erred in dismissing the Amended Complaint on exhaustion grounds because the BIA lacks the authority to grant all the relief they seek, and administrative exhaustion does not apply when an agency cannot grant the relief a party seeks. In McCarthy v. Madigan, the Supreme Court noted that exhaustion may not apply when "an agency may be competent to adjudicate the issue

_____

[2]On appeal, the Allottees represent they are dropping their "Past Trespass" claim, effectively acknowledging that the 1993 renewal was valid. Thus, their claims for damages and unjust enrichment for the pipeline's operation between 1993 and the easement's expiration in 2013 fail because a valid contract existed during that period. See JN Expl. & Prod. v. W. Gas Res., Inc., 153 F.3d 906, 910 (8th Cir. 1998). This is now law of the case.

presented, but . . . lack[s] authority to grant the type of relief requested." 503 U.S. 140, 148 (1992); see id. at 156 (Rehnquist, C.J., concurring) (exhaustion "improper" when litigant seeks relief that is unavailable as an administrative remedy); Alpharma, Inc. v. Pennfield Oil Co., 411 F.3d 934, 937-38 (8th Cir. 2005).

On appeal, both parties agree the Indian Right-of-Way Act and its implementing regulations do not authorize the BIA to award the Allottees administrative trespass remedies. Section 169.410 only authorizes the BIA to seek administrative and judicial remedies on behalf of individual Indian landowners. The district court erred in not considering this exhaustion factor. The Allottees argue that lack of remedial authority is dispositive. Andeavor counters that the agency holdover process is not complete, that the "administrative remedy in itself is a remedy," and that it would be "untenable" if the case was not dismissed and the BIA approved a right-of-way while the Allottees were suing for trespass. Andeavor further notes the regulations provide procedures the Allottees may follow to appeal the BIA's decisions or its failure to act. See 25 C.F.R. §§ 2.6, 2.8, 169.13. And § 169.410, which the agency has described as "exclusive,"[3] authorizes the BIA to "recover possession on behalf of the Indian landowners, and pursue any additional remedies available under applicable law."

We find nothing in the Indian Right-of-Way Act, 25 U.S.C. §§ 323-28, or its implementing regulations, 25 C.F.R. pt. 169, authorizing the BIA to award the Allottees damages or injunctive relief for Andeavor's alleged ongoing trespass. They only appear to authorize the BIA to impose administrative sanctions for a holdover grantee's trespass, including an order that the grantee stop operating the pipeline, see § 169.404(b)(3), and to seek judicial remedies on behalf of individual Indian landowners. Accordingly, we conclude the district court erred in finding the Allottees

---

[3]See Rights-of-Way on Indian Lands, 80 Fed. Reg. 72492, 72523 (Nov. 19, 2015) ("The final rule addresses holdovers exclusively in FR 169.410 . . . .").

-7-

failed to exhaust required administrative remedies. What is far less clear is whether in this situation the agency's inability to provide all the remedies the Allottees seek warrants the further conclusion that the district erred in exercising its judicial discretion to require non-mandatory exhaustion.

### III. The Primary Jurisdiction Alternative

As Andeavor argued in its Brief, exhaustion of administrative remedies is not the only jurisdictional issue presented on this record:

> The doctrine of primary jurisdiction, like the rule requiring exhaustion of administrative remedies, is concerned with promoting proper relationships between the courts and administrative agencies charged with particular regulation duties. "Exhaustion" applies where a claim is cognizable in the first instance by an administrative agency alone; judicial interference is withheld until the administrative process has run its course. "Primary jurisdiction," on the other hand, applies where a claim is originally cognizable in the courts, and comes into play whenever enforcement of the claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body; in such a case, the judicial process is suspended pending referral of such issues to the administrative body for its views.

United States v. Western Pac. R.R., 352 U.S. 59, 63 (1956). "No fixed formula exists for applying the doctrine of primary jurisdiction." Id. at 64. "The advisability of invoking primary jurisdiction is greatest when the issue is already before the agency," and the agency's "informed opinion will be of material aid to the district court in the resolution of" remedial issues including damage claims. Miss. Power & Light Co. v. United Gas Pipe Line Co., 532 F.2d 412, 420 (5th Cir. 1976). Though the district court did not discuss this jurisdictional alternative and the Allottees did not refer to it in their initial Brief, "its invocation cannot be waived by the failure of the parties

to argue it, since the doctrine exists for the proper distribution of power between judicial and administrative bodies." Red Lake Band of Chippewa Indians v. Barlow, 846 F.2d 474, 476 (8th Cir. 1988).

In their Reply Brief, the Allottees argue primary jurisdiction does not apply because "a trespass dispute does not fall outside the conventional competence of the courts" and because Congress granted them a cause of action to enforce allotment rights in 25 U.S.C. § 345.[4] To put the primary jurisdiction issue in proper perspective, it is necessary to discuss in some detail two additional aspects of the case: first, the historical background underlying the Allottees' assertion they have a federal common law claim for trespass on their individually owned Indian lands; second, the unusual series of actions taken by the BIA after the district court dismissed the Amended Complaint in April 2020.

**A. Federal Common Law Claims by Indians.** Andeavor argues that we lack subject matter jurisdiction because the Allottees do not have a federal common law trespass claim. The Allottees argue we have federal question jurisdiction under 28 U.S.C. § 1331 because their trespass claims arise under federal common law. The statutory grant of jurisdiction in § 1331 "will support claims founded upon federal common law as well as those of a statutory origin." Nat'l Farmers Union Ins. Cos. v. Crow Tribe of Indians, 471 U.S. 845, 850 (1985). In this case, we see no serious question of subject matter jurisdiction because if the Allottees have a valid claim for Andeavor's alleged trespass on Indian lands, without question it is a claim under

---

[4]This 1894 statute grants district courts jurisdiction over "suits involving allotments." United States v. Mottaz, 476 U.S. 834, 845 (1986); see Nahno-Lopez v. Houser, 625 F.3d 1279, 1282 (10th Cir. 2010). We have held that when a plaintiff holds fee title to the land, a "complaint seeking relief for trespass does not state a claim contemplated by § 345." United States ex rel. Kishell v. Turtle Mountain Hous. Auth., 816 F.2d 1273, 1275 (8th Cir. 1987). Nor does the statute preclude the doctrine of primary jurisdiction.

federal law. But whether the Allottees' assertion of a federal *common law* cause of action states a claim on which relief can be granted is a core issue that at some point must be resolved by a federal court. It is a complex issue.

The Constitution granted Congress "plenary authority" to "legislate concerning tribal property." Winton v. Amos, 255 U.S. 373, 391 (1921). With its adoption, "Indian relations became the exclusive province of federal law." Cnty. of Oneida, N.Y. v. Oneida Indian Nation of N.Y., 470 U.S. 226, 234 (1985) (Oneida II). The initial federal approach to Indian land policy was to establish tribal reservations by treaty. See Leech Lake Band of Chippewa Indians v. Cass Cnty., 108 F.3d 820, 822 (8th Cir. 1997), rev'd on other grounds, 524 U.S. 103 (1998).

In Oneida Indian Nation of N.Y. v. County of Oneida, N.Y., 414 U.S. 661 (1974) (Oneida I), the Supreme Court reversed the dismissal for lack of subject matter jurisdiction of a suit by the Oneida Nation challenging the conveyance of lands that early federal treaties had reserved for the tribe. The Court noted the "accepted doctrine . . . that although fee title to the lands occupied by Indians when the colonists arrived became vested in the sovereign -- first the discovering European nation and later the original States and the United States -- a right of occupancy in the Indian tribes was nevertheless recognized." Id. at 667. "That right, sometimes called Indian title and good against all but the sovereign . . . was extinguishable only by the United States." Id.; see Wolfchild, 824 F.3d at 767-68 n.2. "Tribal rights were . . . entitled to the protection of federal law, and with respect to Indian title based on aboriginal possession, the power of Congress is supreme." Oneida I, 414 U.S. at 669 (cleaned up). "[A]bsent federal statutory guidance, the governing rule of decision would be fashioned by the federal court in the mode of the common law." Id. at 674; see Oneida II, 470 U.S. at 236.

Relying on the Oneida decisions, the Allottees argue that individual Indian landowners have federal common law claims against trespassers like Andeavor. But

-10-

this case is distinguishable from <u>Oneida</u> in two significant respects -- the Allottees are not a tribe, like the Oneida Nation, and the alleged source of their ownership interests was federal statutory allotments, not necessarily Indian title. In <u>Oneida I</u>, the Supreme Court carefully distinguished its prior decision in <u>Taylor v. Anderson</u>, 234 U.S. 74 (1914), which held that federal jurisdiction did not extend to an ejectment action by individual Indians based on lands they acquired under federal patents:

> <u>Taylor</u> is more like those cases indicating that *a controversy in respect of lands has never been regarded as presenting a Federal question merely because one of the parties to it has derived his title under an act of Congress*. Once patent issues, the incidents of ownership are, for the most part, matters of local property law to be vindicated in local courts, and in such situations it is normally insufficient for "arising under" jurisdiction merely to allege that ownership or possession is claimed under a United States patent.
>
> \* \* \* \* \*
>
> *Here, the Oneidas assert a present right to possession based in part on their aboriginal right of occupancy which was not terminable except by act of the United States.* Their claim is also asserted to arise from treaties guaranteeing their possessory right until terminated by the United States, and it is to these treaties that we must look to ascertain the nature of these Indian rights, and the extent of them. Finally, the complaint asserts a claim under the Nonintercourse Acts which put in statutory form what was or came to be the accepted rule -- that the extinguishment of Indian title required the consent of the United States. To us, it is sufficiently clear that the controversy stated in the complaint arises under the federal law within the meaning of the jurisdictional statutes and our decided cases.

<u>Id.</u> at 676-78 (emphasis added; cleaned up). In a concurring opinion, Justices Rehnquist and Powell observed that the Oneidas' claimed right to possession "is based not solely on the *original* grant of rights in the land but also upon the Federal Government's subsequent guarantee" of those rights by statute. <u>Id.</u> at 684. When the

-11-

case returned to the Supreme Court in Oneida II, the Court affirmed the finding of liability under federal common law, reaffirming "that Indians have a federal common law right to sue to enforce their aboriginal land rights." 470 U.S. at 235 (citations omitted). The Court noted that "Oneida I implicitly assumed that the Oneidas could bring a common-law action to vindicate their aboriginal rights," and that "absent federal statutory guidance, the governing rule of decision would be fashioned by the federal court in the mode of the common law." Id. at 236.

What is referred to as the "Allotment Era" began in the late 1800s, when Congress adopted a policy that carved reservations into allotments and assigned land parcels to individual tribal members. The goal was to extinguish tribal sovereignty, erase reservation boundaries, and thereby compel assimilation of Indians into society at large. In the early years of this policy, many tribal members lost their allotted lands to non-Indians in unfair or fraudulent transactions. See Cnty. of Yakima v. Confederated Tribes & Bands of the Yakima Indian Nation, 502 U.S. 251, 254 (1992). Congress responded by enacting the Indian General Allotment Act of 1887, known as the Dawes Act.[5] The Dawes Act sought to prevent alienation of Indian-owned lands by replacing the fee-simple-ownership of early allotments with a trust-based model in which the President allotted tracts to individual Indian landowners. The United States held these allotments in trust for twenty-five years, after which the individual Indian landowners acquired fee-simple title to the property. Id.

Allotted lands held in trust under the Dawes Act proved to be "administratively unworkable and economically wasteful." Hodel v. Irving, 481 U.S. 704, 707 (1987). In 1934, Congress "[r]eturn[ed] to the principles of tribal self-determination and self-governance which had characterized the pre-Dawes-Act era," "halted further allotments," and "extended indefinitely the existing periods of trust applicable to

---

[5]24 Stat. 388, 25 U.S.C. § 331 *et seq.*, repealed by Indian Land Consolidation Act Amendments of 2000, Pub. L. No. 106-462, §§ 101-103, 114 Stat. 1991.

already allotted (but not yet fee-patented) Indian lands." Yakima, 502 U.S. at 255, citing the Indian Reorganization Act, 48 Stat. 984, codified as amended at 25 U.S.C. § 5101 *et seq.*; see §§ 5101, 5102. This statute did not affect the two-thirds of allotted Indian lands already acquired by non-Indians, resulting in a checkerboard of federally-held trust lands and privately-owned fee-simple lands that continues on many reservations today. Upper Skagit Indian Tribe v. Lundgren, 138 S. Ct. 1649, 1653 (2018); see Yakima, 502 U.S. at 255-56. The Allottees are equitable owners of allotted land that continues to be federally-owned trust land.

As the country industrialized and moved West, the "checkerboard" of lands owned by tribes, individual Indians, and individual non-Indians complicated the development of "train tracks, telegraph wires, and other conduits of modern commerce." Davilla v. Enable Midstream Partners L.P., 913 F.3d 959, 964 (10th Cir. 2019). Special access statutes limiting rights-of-way to cross Indian lands further complicated the problem. See Neb. Pub. Power Dist. v. 100.95 Acres of Land, 719 F.2d 956, 958 (8th Cir. 1983). In response, Congress enacted the Indian Right-of-Way Act of 1948 to simplify the right-of-way granting process. Id. at 959. That statute governs the BIA's authority in resolving the Andeavor holdover dispute.

Andeavor argues that the Allottees have no federal common law trespass claims under Oneida I and Oneida II, which limit federal *common law* remedies to Indian tribal landowners whose present right to possession is based on an unextinguished Indian title (*aboriginal* right of occupancy). The Allottees counter, citing Oneida II for the proposition that "Indians have a federal common law trespass action against those who maintain an unauthorized presence on Indian trust land" because the "Indians' right to 'exclusive possession' of their land is 'a federal right.'" They further argue that 25 C.F.R. § 169.413 governs who may bring an action for trespass on Indian lands in federal court and allows either the BIA or the Allottees to independently do so, and that the BIA's ability to bring a claim on their behalf does not impair their individual rights to sue.

-13-

The Allottees' argument is not clearly supported by the Supreme Court's holding in Oneida I or Oneida II, as we expressly ruled in Wolfchild v. Redwood County. In Wolfchild, putative class-plaintiffs asserted federal common law ejectment and trespass claims against numerous defendants, alleging they owned exclusive title to individual parcels of land in southern Minnesota that the Secretary of the Interior, acting under an 1863 Act of Congress, set aside for their Mdewakanton Sioux ancestors. See 824 F.3d at 765-67. In affirming the district court's grant of motions to dismiss, we held that under Oneida I, "federal common law claims arise when a *tribe* 'assert[s] a present right to possession based on their *aboriginal* right of occupancy.'" Id. at 768 (emphasis and brackets in original) (quoting Oneida I, 414 U.S. at 677). The Wolfchild plaintiffs failed to state a claim under federal common law because they did not allege "*aboriginal* title," and the 1863 Act only concerned lands allocated to "*individual[s]* -- not a tribe." Id. at 768 (emphasis in original). The plaintiffs therefore failed to state a federal common law claim:

> [T]he language of the 1863 Act directly contradicts any claim that the loyal Mdewakanton had aboriginal title to the twelve square miles. . . . Thus, assuming the twelve square miles were set apart for the loyal Mdewakanton, the land was for the benefit of each *individual* -- not a tribe. This lawsuit, therefore, concerns "lands allocated to individual Indians, not tribal rights to lands," and does not fall into the federal common law articulated in the Oneida progeny.

Id. (quoting Oneida I; emphasis in original). We went on to conclude that the 1863 Act did not provide a private federal remedy and affirmed the dismissal.

In their Brief on appeal, the Allottees argue that in Wolfchild, we "never addressed whether an Indian owner of allotted trust land has a cognizable claim for trespass under federal common law -- so Wolfchild has no direct bearing on whether, here, the Individual Landowners have a federal common law claim for trespass." We

-14-

agree our decision in Wolfchild does not directly control the issue in this case because the plaintiffs in Wolfchild were fee simple owners of the land in question, whereas the Allottees are equitable owners of lands owned by the federal government in trust. But in Oneida I, the Supreme Court distinguished the Oneidas' claim at issue from the Indian landowner claim in Taylor v. Anderson that did not raise a federal question:

> Here, the right to possession itself is claimed to arise under federal law in the first instance. Allegedly, aboriginal title of an Indian tribe guaranteed by treaty and protected by statute has never been extinguished. In Taylor, the plaintiffs were individual Indians, not an Indian tribe; and the suit concerned lands allocated to individual Indians, not tribal rights to lands. Individual patents had been issued with only the right to alienation being restricted for a period of time.

414 U.S. at 676. Thus, while the specific issue in this case was not "addressed" in Wolfchild, our reliance on the above-quoted reasoning has a "direct bearing" on whether the Allottees have the federal common law rights they assert, or whether they must instead find an alternative basis for their claims under federal law. Our analysis in Wolfchild is certainly open to interpretation, and the BIA's views as to whether the distinction drawn in Oneida I applies to a right-of-way holdover situation may be relevant and persuasive. So we decline to decide the issue at this time.[6]

---

[6]The Allottees urge us to follow the lead of Ninth and Tenth Circuit decisions that contain dicta supporting the broad federal common law claim they assert. But we have not found, nor do Allottees cite, a Ninth Circuit case holding that federal common law encompasses suits by *individual* Indian landowners. And in Davilla, a pipeline trespass case, the Tenth Circuit assumed the common law right existed based on the parties' agreement but stated it was "unclear whether we have ever formally recognized a federal claim for trespass on an Indian allotment, or simply assumed such a claim's existence." 913 F.3d at 965 & n.2 (citing Nahno-Lopez). Thus, neither the Ninth Circuit nor the Tenth Circuit has definitively resolved the issue.

**B. Recent BIA Actions.** On July 2, 2020, after the Allottees submitted their initial Brief on appeal, the Regional Director of the BIA's Great Plains Regional Office (which covers North Dakota) sent a formal Notification of Trespass Determination to Andeavor (the "Notice"). The Notice stated that the pipeline had been trespassing on fifty acres of individually-owned trust lands for seven years, reflecting Andeavor's lack of good faith negotiations, and therefore the pipeline was no longer in the landowners' best interest. The BIA ordered Andeavor to immediately cease pipeline use and pay treble damages totaling $187.2 million within thirty days, a decision Andover could appeal to the Interior Board of Indian Appeals (IBIA). Andeavor appealed, arguing the Notice ignored that it was in holdover status while negotiating with landowners, ignored its substantial work to obtain fair-market value appraisals, disregarded its record-setting offer of $66,000 per acre to the landowners, and calculated damages based on inapplicable grazing regulations.

Before the IBIA could rule, the Assistant Secretary for Indian Affairs assumed jurisdiction over the appeal (as regulations allow), vacated the Notice, and remanded to the Regional Director to issue a new decision based on specified criteria. The Assistant Secretary's order asserted that federal common law applied to Andeavor's trespass. In later supplemental guidance, the Regional Director was advised to rely only on 25 C.F.R. § 169.410 and common law remedies to address the trespass. The guidance stated that federal common law authorizes the BIA to seek judicial remedies, including compensatory damages, on behalf of Indian landowners for trespass claims against right-of-way holdovers. It cited 28 U.S.C. § 2415(b), a statute of limitations that requires actions by the United States or its agencies on behalf of "a recognized tribe, band, or group of American Indians" to be brought "within six years and ninety days after the right of action accrues."

On remand, the Regional Director issued a Second Notice reducing the damages award to just under $4 million, ordering Andeavor to immediately cease operating the pipeline, and informing Andeavor the BIA might petition the

Department of Justice to seek common law damages including an accounting of all rents and profits tied to its trespass. Both Andeavor and the Allottees appealed the Second Notice to the IBIA. On January 14, 2021, the Assistant Secretary again assumed jurisdiction over the appeal, affirmed the Second Notice in its entirety, and declared it judicially reviewable as a final agency action. The IBIA dismissed the parties' appeals.

On March 12, 2021, after the change in administrations, the Acting Secretary of the Interior issued a Decision vacating all prior BIA actions -- from the Regional Director's First Notice to the Assistant Secretary's January 14 Decision -- and returning the matter to the Regional Director with directions to:

1.   take such action as is necessary to address [Andeavor's] continued occupation of the expired right-of-way.

2.   provide each of the interested parties with a full and fair opportunity to be heard in this matter, and

3.   issue a new decision, as may be necessary and appropriate.

We are not aware of any further administrative actions the BIA has taken in this dispute. Nor are we aware the BIA has filed an action exercising its claimed authority to assert federal common law trespass claims against Andeavor on behalf of the Allottees. In April 2021, an Andeavor subsidiary filed suit against the United States in the District of North Dakota, seeking to set aside the Acting Secretary's vacatur. See Complaint, Tesoro High Plains Pipeline Co. v. United States, No. 1:21-cv-00090-DMT, ECF No. 1 (D.N.D. Apr. 23, 2021). That action is pending.

**C. Primary Jurisdiction Analysis.** Taking these additional factors into account, we conclude the record on appeal and relevant authorities present a situation where it is proper to invoke the discretionary judicial doctrine of primary jurisdiction

and stay the action pending exercise of jurisdiction the agency has asserted, rather than invoke discretionary exhaustion principles and dismiss the action, which might delay determination of the Allottees' judicial claims indefinitely depending on what action, if any, the BIA determines is "necessary and appropriate."

First, the Allottees do not hold legal title to their lands. The federal government is the fee owner, holding the allotted lands in trust for the Allottees' benefit. The BIA's role as trustee is the core of the many protections Congress has provided for these Indian lands. See 25 U.S.C. §§ 2, 348. The BIA grants and administers rights-of-way over lands held in trust, and it protects those lands both from those invading without a right-of-way, and from grantees that violate their right-of-way, including holdovers. See § 169.410. The regulations require the BIA to "support tribal self-determination and self-governance . . . and defer to the maximum extent possible to Indian landowner decisions regarding their Indian land." 25 C.F.R. § 169.1(a). "The judicial determination of controversies concerning [allotted] lands has been commonly committed exclusively to federal courts." Minnesota v. United States, 305 U.S. 382, 389 (1939). But the BIA's extensive authority, protective role, and prior involvement in the controversy make this a prime example of when deferring to an agency's primary jurisdiction is appropriate. Though the Allottees' claims are cognizable in court, their sound determination requires resolution of issues that have been placed within the special competence of an administrative body and that are already before the agency. Western Pac. R.R., 352 U.S. at 63.

Second, the BIA has not simply been involved in this controversy, it has taken action, now vacated, and the Acting Secretary of the Interior has directed the Regional Director to "issue a new decision, as may be necessary and appropriate." Because the BIA cannot afford the Allottees the full relief they seek, the district court need not stay this action until the administrative proceedings conclude. But any action the BIA now takes will be of significance in resolving the judicial dispute. For example, it is almost absurd to think the court will order Andeavor to remove a few

miles of its 500-mile pipeline at the individual Allottee landowners' request if the BIA, the Tribe, or a significant portion of the other right-of-way beneficiaries object. This portion of the relief the Allottees seek must await agency action.

With respect to the Allottees' claim for common law damages, the BIA may take the position that it has the exclusive right to seek damages on behalf of the Allottees under 25 C.F.R. § 169.410. See Rights-of-Way on Indian Lands, 80 Fed. Reg. at 72523.[7] The Allottees argue their independent right to pursue trespass remedies is confirmed by 25 C.F.R. § 169.413:

> If an individual or entity takes possession of, or uses, Indian land . . . without a right-of-way and a right-of-way is required, the unauthorized possession or use is a trespass. . . . [The BIA] may take action to recover possession . . . and pursue any additional remedies available under applicable law. *The Indian landowners may pursue any available remedies under applicable law, including applicable tribal law*.

(Emphasis added.) This argument seems contrary to the Allottees' basic legal position, because a claim under § 169.413 would be a statutory claim, not a common law claim, and the Supreme Court held in Oneida I, 414 U.S. at 674, and repeated in Oneida II, 470 U.S. at 236, that the governing rule of decision is federal common law "absent federal statutory guidance." Congress has the power to create private rights of action. We find no express private right of action in the Indian Right-of-Way Act, and the Supreme Court does not look with favor on implied private rights of action. Cf. Poafpybitty v. Skelly Oil Co., 390 U.S. 365, 370 (1968). The views of the BIA on these legal issues would obviously be important.

---

[7]Once a right-of-way is in use, it is the agency's responsibility to supervise the easement and determine when to renew it. It is also in the superior position, as the trustee for all Indian landowners, to pursue remedies that in its judgment advance their collective interest -- especially where, as here, many of the tracts at issue are highly fractionated, and unanimous agreement may be difficult to attain.

Third, the Supreme Court noted in <u>McCarthy</u> that "even where a controversy survives administrative review, exhaustion of the administrative procedure may produce useful record for subsequent judicial consideration, especially in a complex or technically factual context." 503 U.S. at 145. This factor supports invoking primary jurisdiction here, at least for a limited time. Not only is the judicial controversy within the BIA's area of expertise, the agency may have, or may be able to efficiently develop, facts that may be relevant to one or more legal issues, such as the extent to which the Allottees' rights as equitable owners of Indian land now held in trust derive from unextinguished aboriginal title as opposed to "lands allocated to individual Indians, not tribal rights to lands." <u>Wolfchild</u>, 824 F.3d at 768.

For these reasons, we conclude that primary jurisdiction, not exhaustion of BIA remedies, is the discretionary doctrine that should be invoked in this case at this stage of the proceedings. Ultimately, the key question is not whether federal law supplies Allottees a cause of action for trespass on individual Indian allotments, but whether there is a common law or statutory claim they have standing to assert and if so, what is the source of the law that will define whether continuing trespass is occurring and what remedies are available to what parties that have rights in the trust lands. The judicial process should be stayed to give the BIA a further opportunity to address these issues. But dismissal is not appropriate because the administrative process will not resolve the Allottees' claims. Rather, the district court should stay the action for a reasonable period of time to see what action the agency may take. The court can then lift the stay, or further suspend the judicial process depending on what action, if any, the agency takes. We leave the details of this process, including the solicitation of views from many parties with disparate interests, to the district court's discretion.

**C. Remaining Issues.** In addition to the trespass claims in Count I of their Amended Complaint, the Allottees asserted three additional claims: Breach of Easement Agreement (Count II); Unjust Enrichment -- Imposition of Constructive

Trust (Count III); and Punitive Damages (Count IV). Because the case must be remanded and stayed, we decline to consider these issues at this time. Among other reasons, the analysis of these issues would likely be affected if the BIA brings a breach-of-contract claim on behalf of the Allottees under the Right-of-Way Act. In a breach-of-contract action involving a right-of-way over individual trust allotments, the United States, as grantor, is an indispensable party. Cf. Cheyenne River Sioux Tribe of Indians v. United States, 338 F.2d 906, 909 (8th Cir. 1964), cert. denied, 382 U.S. 815 (1965); see also Minnesota, 305 U.S. at 388.

## III. Conclusion

For the foregoing reasons, the judgment of the district court is reversed and the case is remanded for further proceedings not inconsistent with this opinion. The Allottees' motion to dismiss Robin Fredericks as a plaintiff is denied.

_____