# United States Court of Appeals

## For the Eighth Circuit

_____

No. 23-3019

_____

JoAnn Chase; Nelson Fredericks, estate of; Inez Burr; Sandra Gillette; Marion Rasmuson; Joan Matthews; Amanda Bird Bear; Roger Bird Bear; Thomas Bird Bear; Jamie Lawrence; Rae Ann Williams; Evelyn Lone Bear; Doreen Charging; Mavis Huber; Betty Young Bird; Noreen Young Bird; Joan Young Bird; Murphy Young Bird; Donovan Fast Dog; Joyce Eakin; Josephine Parenteau; George Fast Dog; Denise Cavanaugh; Karen Koite; Arnold Young Bird; Darryl Turner; Heather Demaray; Darlene Edley; Eunice White Owl; Linda Kroupa; Waylon Young Bird; Deborah Staples; Anthony White Owl; Eugene White Owl; Kathleen White Owl; Margo Bean; Albert Whitman; Herbert Pleets; Monique Pleets; Sharon Aubol; Janet Benton; Gloria Fast Dog; Valeri Hosie; Betty Matthews; Kenneth Matthews, Sr.; Sheridan Matthews; Wilson White Owl; Tiffany Williams

*Plaintiffs - Appellants*

v.

Andeavor Logistics, L.P.; Andeavor, formerly known as Tesoro Corporation; Tesoro Logistics GP, LLC; Tesoro Companies, Inc.; Tesoro High Plains Pipeline Company, LLC

*Defendants - Appellees*

------------------------------

United States of America

*Amicus on Behalf of Appellant(s)*

_____

Appeal from United States District Court
for the District of North Dakota - Western

_____

Submitted: October 22, 2024
Filed: January 30, 2026
_____

Before LOKEN, SMITH, and GRASZ, Circuit Judges.
_____

LOKEN, Circuit Judge.

This is a protracted oil and gas pipeline dispute between Andeavor Logistics L.P. and affiliated co-defendants (collectively, "Andeavor") and individuals with beneficial ownership interests in Indian trust lands on the Fort Berthold Reservation in North Dakota (the "Allottees").[1] Andeavor owns and has operated the 500-mile intrastate High Plains Pipeline System that transports crude oil eastward from the "oil patch" in western North Dakota. In 1953, acting under the Indian Right-of-Way Act of 1948 ("IRWA"), 25 U.S.C. §§ 323-28,[2] the Secretary of the Interior granted

_____

[1]"The term 'trust lands' in federal Indian law means lands purchased by the Secretary of the Interior under § 5 of the Indian Reorganization Act of 1934, title to which is 'taken in the name of the United States in trust for the Indian tribe or individual Indian for which the land is acquired.' Indian Reorganization Act of 1934, ch. 576, § 5, 48 Stat. 984, 985 (codified at 25 U.S.C. § 465, later transferred to § 5108)." Mille Lacs Band of Ojibwe v. Madore, 128 F.4th 929, 938 n.5 (8th Cir. 2025). The Fort Berthold Reservation was recognized by executive order in 1870 as tribal land reserved for the Mandan, Hidatsa, and Arikara Tribes, known as the Three Affiliated Tribes (the "Tribe"). See Treaty of Fort Laramie, September 17, 1851, 11 Stat. 749 (1851); Exec. Order of April 12, 1870. The Reservation's current boundaries were established by an 1891 statute that approved a land cession agreement. See 1 C. Kappler, Indian Affairs, Laws and Treaties 881-83 (1904); Act of Mar. 3, 1891, Art. I, 26 Stat. 1032.

[2]IRWA authorizes the Secretary to grant "rights-of-way for all purposes, subject to such conditions as he may prescribe, over and across any lands now or

-2-

Andeavor's predecessor a 20-year right-of-way allowing the pipeline to cross Indian lands held in trust within the Reservation. See 25 C.F.R. § 169.5(a)(8) (authorizing rights-of-way for oil and gas pipelines crossing Indian lands). After two 20-year renewals, the right-of-way expired in 2013. Despite unsuccessful negotiations to obtain a new right-of-way agreement, Andeavor continued operating the pipeline over lands held in trust by the United States for the benefit of the Tribe and for the benefit of more than 35 individually-owned tracts.

The Allottees filed this putative class action in October 2018, alleging continuing trespass in violation of their federal common law right to possess their individually-owned tracts, breach of the expired easement agreement, and unjust enrichment. They seek compensatory and punitive damages, an accounting of profits, disgorgement, and an injunction requiring Andeavor to cease operations, remove the pipeline, and restore the lands to their original condition.

Andeavor moved to dismiss, arguing the Allottees failed to state a valid cause of action and failed to exhaust administrative remedies. In April 2020, the district court granted Andeavor's motion in part, dismissing the case for failure to exhaust administrative remedies, without deciding many other issues. The Allottees appealed. In September 2021, we reversed the court's decision to dismiss, concluding the Allottees were not required to exhaust administrative remedies because IRWA and its implementing regulations do not grant the BIA authority to award trespass

hereafter held in trust by the United States for individual Indians or Indian tribes." 25 U.S.C. § 323. For lands held in trust for the Tribe, IRWA provides that the Secretary must obtain tribal consent before granting a right-of-way; rights-of-way over lands held in trust for individual Indians may be granted without the consent of all owners if certain conditions are satisfied. Id. § 324. The Secretary's regulations, authorized by § 328, are currently found in 25 C.F.R. §§ 169.101 et seq., part of the Secretary's regulations administered by the Department of the Interior's Bureau of Indian Affairs ("BIA"). The Secretary must guarantee fair compensation payments to Indian owners as deemed appropriate. § 325; 25 C.F.R. § 169.112(a).

damages and other relief the Allottees seek. Chase v. Andeavor Logistics, L.P., 12 F.4th 864, 868-70 (8th Cir. 2021) (Chase I). Noting that "any action the BIA now takes will be of significance in resolving the judicial dispute," and invoking the doctrine of primary jurisdiction, we directed the district court to stay but not dismiss the action "for a reasonable period of time to see what action the agency may take." Id. at 876-77. We declined to consider the Allottees' additional claims of breach of the easement agreement, unjust enrichment, and punitive damages. Id. at 878.

In 2023, the district court[3] reconsidered the Allottees' claims, applying our guidance in Chase I, and again dismissed all claims with prejudice. Chase v. Andeavor Logistics, L.P, 686 F. Supp. 3d 854 (D.N.D. 2023) (Chase). The court also denied their motion to intervene in a related case, Tesoro High Plains Pipeline Co., LLC v. United States, D.N.D. No. 1:21-CV-90 (Tesoro), agreeing with the United States that it adequately represents the Allottees' interests in Tesoro and allowing them to join would unduly delay and prejudice the litigation. Chase, 686 F. Supp. 3d at 877-79.[4]

The Allottees appeal the second dismissal of their trespass, unjust enrichment, and breach of easement agreement claims. They also appeal the court's denial of their motion to intervene and grant of a preliminary injunction in Tesoro, asserting the district court failed to decide whether consolidation of the two cases is appropriate. Prior background facts and the early procedural history of the dispute were reviewed

[3]The Honorable Daniel M. Traynor, United States District Judge for the District of North Dakota.

[4]A different group of Allottees appealed the district court's denial of intervention and grant of a preliminary injunction in the separate Tesoro action. On October 16, 2025, we granted the government's unopposed motion to postpone oral argument and removed this case from our October oral argument calendar, to be rescheduled by the court at a later date that has not yet been determined. Tesoro High Plains Pipeline Co., LLC v. Crows Heart, No. 24-2860, Order.

in our prior opinion. See Chase I, 12 F.4th at 867-68. Resolution of the issues raised in this second appeal turns in large part on agency actions before and following our remand, which we next address.

We affirm the district court's decision to dismiss the Allottees' claims for trespass, breach of contract, and unjust enrichment; we remand for further consideration of the Allottees' motion to consolidate this case and Tesoro.

## I. Agency Proceedings Before Remand.

When the right-of-way easement agreement expired in 2013 and grantee Andeavor "remain[ed] in possession," the Secretary's regulations provide that the BIA may treat the "unauthorized possession as a trespass under applicable law" and, after determining that no good-faith negotiations exist, "may take action to recover possession on behalf of the Indian landowners, and pursue any additional remedies available under applicable law, such as a forcible entry and detainer action." 25 C.F.R. § 169.410.[5] In 2013, Andeavor sought to negotiate renewals of its rights-of-way, negotiating first with the Tribe at its request. In 2017, Andeavor and the Tribe reached agreement to renew the right-of-way over tribal lands for 28 years and to pay trespass damages of approximately $2 million per acre for operations conducted after the right-of-way expired. Andeavor then began negotiations with individual Indian beneficial landowners to renew access over their trust lands. Some Allottees declined to renew, and negotiations stalled.

In January 2018, the BIA issued Andeavor a 10-Day Show-Cause Letter stating that the pipeline had been trespassing on individually-owned Indian lands since the

_____

[5]The regulations also provide that "Indian landowners may pursue any available remedies under applicable law, including applicable tribal law," 25 C.F.R. § 169.413, as we discuss in Part IV.

right-of-way expired in 2013. Andeavor responded that it was negotiating with individual landowners to secure their consent. Many Allottees confirmed that good-faith negotiations were ongoing, and counsel for the Allottees requested that the BIA refrain from pursuing trespass remedies while negotiations continued. When negotiations again stalled, some 35 Allottees filed this putative class action.

The district court dismissed the action for failure to exhaust administrative remedies in April 2020. Between July 2020 and March 2021, with the Allottees' Chase I appeal pending, the BIA took a series of contradictory actions that dramatically changed the administrative landscape. See Chase I, 12 F.4th at 875-76. In July 2020, after the Allottees submitted their opening appeal brief, the Regional Director of the BIA's Great Plains Regional Office (which has jurisdiction over North Dakota) issued a formal Notification of Trespass Determination (the "Notice"). The Notice asserted that the pipeline had been trespassing on approximately 50 acres of individually-owned trust lands for seven years, that Andeavor failed to conduct good-faith negotiations, that continued pipeline operations were no longer in the best interest of the landowners, and ordered Andeavor to cease operations and pay treble damages totaling $187.2 million within 30 days.

Andeavor appealed this decision to the Interior Board of Indian Appeals ("IBIA"), arguing that it had maintained holdover status while actively negotiating with landowners, obtained fair-market appraisals, and offered a record-setting $66,000 per acre, and that the trespass damages assessed in the Notice were improperly calculated. The Assistant Secretary for Indian Affairs ("AS-IA"), exercising authority to assume jurisdiction, vacated the Notice and remanded to the Regional Director with instructions to issue a new decision under specified legal standards, relying on 25 C.F.R. § 169.410 and common law remedies. The AS-IA explained that federal common law authorizes the BIA to pursue judicial damage remedies on behalf of Indian landowners for a right-of-way holdover's trespass.

On remand from the AS-IA, the Regional Director issued a Second Notice in December 2020, reducing the trespass damages to just under $4 million, directing Andeavor to immediately cease pipeline operations, and warning that the BIA could refer the matter to the Department of Justice to pursue further remedies. Both Andeavor and the Allottees appealed the Second Notice to the IBIA. On January 14, 2021, the AS-IA again assumed jurisdiction, affirmed the Second Notice in full, and declared it a final agency action subject to judicial review. Andeavor then paid the damages required by the Second Notice, shut down pipeline operations, but left the pipeline in place.

In March 2021, following a change in administration, the BIA vacated all prior decisions related to the individually-owned trust lands, including the December 2020 Second Notice. Tesoro, a subsidiary of Andeavor, then filed a second action in the District of North Dakota against the BIA, the Department of the Interior, and the United States, challenging the vacatur and related agency actions under the federal Administrative Procedures Act (APA), Tesoro High Plains Pipeline Co. v. United States, Case No. 1:21-cv-00090 ("Tesoro"). Tesoro was assigned to District Judge Traynor but was not consolidated with the ongoing Chase lawsuit then pending on appeal. In mid-September 2021, we reversed the district court's decision to dismiss for failure to exhaust administrative remedies and remanded with directions to stay but not dismiss the action "for a reasonable period of time to see what action the [BIA] may take." Chase I, 12 F.4th at 877.

## II. Proceedings Following Remand.

On remand, the district court stayed the case pending further action by the BIA and directed the parties to show cause why this case should not be joined with Tesoro. The Allottees supported joinder and consolidation or in the alternative intervention; Andeavor opposed joinder, consolidation, or intervention. The district court awaited BIA action, as our opinion in Chase I encouraged. In February 2022, the United

States filed an answer in Tesoro for itself and the federal agency defendants, asserting counterclaims on behalf of the Allottees against Andeavor and its affiliates for federal common law trespass and ejectment. Andeavor moved to dismiss the counterclaims. In response, the United States argued it has authority to assert federal common law trespass trust claims on behalf of the beneficial owners, but declined to take a position on whether the Allottees can raise those claims in their individual capacities:

> The United States does not, at this time, make any assertions about the Allottees' ability to raise a federal common-law trespass claim. Nor is the Allottees' ability to raise such a claim currently before this Court. The only issue this Court must decide is whether the United States, in its duty as legal titleholder and trustee, can raise a claim for federal common-law trespass on federal trust land. For the aforementioned reasons, it can.

Tesoro, United States' Resp. in Opp'n to Plt.'s Mot. to Dismiss Counterclaim at 22 n.17 (Oct. 10, 2022). The district court, noting the counterclaims are distinct from Tesoro's APA challenges to BIA administrative actions, denied Tesoro's motion to dismiss the counterclaims and severed and stayed proceedings on those claims pending resolution of the underlying APA claims, which have not yet been decided. Tesoro, No. 1:21-cv-90, 2023 WL 7386388, at *3 (D.N.D. Nov. 8, 2023).

Tesoro remains unresolved. Indeed, it is far from resolved -- there is pending in our court an interlocutory appeal from the district court's grant of a preliminary injunction barring further administrative action until the court rules on the merits of the APA claims. Tesoro, No. 1:21-cv-90, 2024 WL 3359433 (D.N.D. July 10, 2024). Thus, our suggested stay of this action "for a reasonable period of time to see what action the [BIA] may take" has not been advanced by the BIA's actions in Tesoro.

By contrast, after our remand, the BIA took *no* further administrative action in this case and asserted *no* position in the district court regarding the Allottees' asserted

federal common law claims. In the briefing and arguing of Andeavor's renewed motion to dismiss the Allottees' claims, the United States filed no pleading and did not seek to participate as *amicus*. But after the Allottees appealed the district court's unfavorable ruling, the United States filed an amicus brief in this court endorsing the Allottees' arguments but adding nothing of substance to their analysis, again reflecting the flip-flopping that has permeated the Secretary of Interior's actions in this complex dispute for more than a decade. The agency and its Department of Justice advocates have thumbed their noses at our request for agency assistance in resolving the difficult issues presented. Accordingly, we will give their amicus brief no deference or separate consideration apart from the actions taken by the BIA prior to our remand and in the Tesoro litigation after remand.

By June 2022, the parties appeared close to a settlement, but a minority of Allottees caused settlement talks to fail. The district court lifted the stay in June 2023, took up Andeavor's amended motion to dismiss, and permitted additional briefing limited to the Allottees' federal common law trespass claims. In August 2023, the district court dismissed the Allottees' claims and denied their request to intervene in Tesoro. Chase, 686 F. Supp. 3d at 879. Grounding its analysis in our Chase I decision, the court concluded that the Allottees failed to state a claim for trespass under federal common law. Id. at 862-75. The court determined that, unlike tribes that possess aboriginal title, no federal common law cause of action is available for individual Indians on lands held in trust by the United States. Id. at 868-72. The court declined the Allottees' invitation to create a federal common law claim if one does not exist. Id. at 873-75. The court dismissed the Allottees' breach of easement claim because the Allottees were not parties to the easement agreement and the United States as right-of-way grantor is an indispensable party. Id. at 875-76. It dismissed the claims for unjust enrichment and punitive damages because, without a valid underlying trespass claim, those claims failed. See id. at 876-77. The court denied Allottees' motion to intervene in Tesoro, concluding the United States

adequately represents their interests and the Allottees did not demonstrate interests that differ from or conflict with the government's interests.  Id. at 877-79.

## III. The Federal Common Law Claims.

**A. Continuing Trespass.** Count I of the Allottees' First Amended Class Action Complaint alleges that Andeavor's conduct after the 1993 Easement expired "constitutes a continuing trespass upon Plaintiff's trust land in violation of the controlling federal statutes, regulations, and federal common law."  In Erie R.R. Co. v. Tompkins, the Supreme Court held that there is "no federal general common law." 304 U.S. 64, 78 (1938).  The Court has since recognized judicial authority to formulate "federal common law."  See United States v. Standard Oil Co., 332 U.S. 301, 308 (1947).  But "[t]he vesting of jurisdiction in the federal courts does not in and of itself give rise to authority to formulate federal common law."  Tex. Ind., Inc. v. Radcliff Materials, Inc., 451 U.S. 630, 640-41 (1981) (citation omitted).  "In the absence of congressional authorization [to formulate federal common law], common lawmaking must be 'necessary to protect uniquely federal interests.'"  Rodriguez v. F.D.I.C., 589 U.S. 132, 136 (2020), quoting Radcliff, 451 U.S. at 640.  Neither the Supreme Court, this court, nor any of our sister circuits has decided whether individual allottees with equitable ownership of land held in trust by the United States have a federal common law trespass claim.  See Chase I, 12 F.4th at 874-75 n.6.

In Chase I, we framed the federal common law issue:

> [I]f the Allottees have a valid claim for Andeavor's alleged trespass on Indian lands, without question it is a claim under federal law.  But whether the Allottees' assertion of a federal *common law* cause of action states a claim on which relief can be granted is a core issue that at some point must be resolved by a federal court.  It is a complex issue.

12 F.4th at 871 (emphasis in original).  The "key question," we explained:

-10-

is not whether federal law supplies Allottees a cause of action for trespass on individual Indian allotments, but whether there is a common law or statutory claim they have standing to assert and if so, what is the source of the law that will define whether continuing trespass is occurring and what remedies are available to what parties that have rights in the trust lands. Id. at 877.

The Constitution granted Congress "plenary authority over the Indians and all their tribal relations, and full power to legislate concerning their tribal property." Winton v. Amos, 255 U.S. 373, 391 (1921). The initial federal approach to Indian land policy was to establish tribal reservations by treaty, an exercise of the President's power "with the Advice and Consent of the Senate, to make Treaties." Art. II, § 2. See Mille Lacs Band, 128 F.4th at 933 n.1. "Once a block of land is set aside for an Indian Reservation and no matter what happens to the title of individual plots within the area, the entire block retains its reservation status until Congress explicitly indicates otherwise." Solem v. Bartlett, 465 U.S. 463, 470 (1984).

Treaties with Indian Tribes was a practice Congress discontinued in 1871. In the late 1800s, Congress adopted a policy of carving recognized reservations into allotments and assigning land parcels to individual tribal members, the goal being to "compel assimilation of Indians into society at large." Chase I, 12 F.4th at 872.[6] Initially, many Indians lost their allotted lands in unfair or fraudulent transactions. Davilla v. Enable Midstream Partners L.P., 913 F.3d 959, 963 (10th Cir. 2019). Congress responded by enacting the Dawes Act in 1887, replacing fee-simple-ownership allotments with a trust-based model that restricted alienation or encumbrance by the allottee. Id. "[T]he United States retained legal title of allotted parcels while Indian allottees received equitable title. Id. An allottee could secure

---

[6]Allotment alone does not revoke a reservation. See United States v. Celestine, 215 U.S. 278, 287 (1909).

-11-

a fee simple land patent only upon dissolution of the trust, which the government would allow after a term of years or by special determination." Id. at 963-64.

Congress abruptly ended the "Allotment Era" in 1934 by enacting the Indian Reorganization Act ("IRA"), 25 U.S.C. §§ 461 *et seq* (transferred to §§ 5101 *et seq*). The IRA "returned to the principles of tribal self-determination and self-governance." Chase I, 12 F.4th at 873:

> Congress halted further allotments and extended indefinitely the existing periods of trust applicable to already allotted (but not yet fee-patented) Indian lands. In addition, the Act provided for restoring unallotted surplus Indian lands to tribal ownership . . . . Except by authorizing reacquisition of allotted lands in trust, however, Congress made no attempt to undo the dramatic effects of the allotment years on the ownership of former Indian lands. It neither imposed restraints on the ability of Indian allottees to alienate or encumber their fee-patented lands nor impaired the rights of those non-Indians who had acquired title to over two-thirds of the Indian lands allotted under the Dawes Act.

Cnty. of Yakima v. Confederated Tribes & Bands of the Yakima Indian Nation, 502 U.S. 251, 255-56 (1992); see also 25 U.S.C. §§ 5101-02, 5126. Under the IRA, the Secretary retained authority to remove trust restrictions and change allotted lands to fee ownership at the request of any allottee or heir. 25 U.S.C. § 392.

The Act of March 3, 1891 directed the Secretary of the Interior to allocate Fort Berthold Reservation lands to individual Indians, with the United States holding title in trust for 25 years before transferring patented ownership to the beneficiary or heir in fee without encumbrances. Art. III-IV, 26 Stat. 1033. Today, the Fort Berthold Reservation trust lands include tribal lands, over 35 tracts in which individual Allottees equitably own the beneficial interest, and a smattering of "fee-patented" tracts in which fee title is owned by individual Indians and non-Indians. See Chase I, 12 F.4th at 873.

The patchwork ownership of lands in Indian country that followed enactment of the IRA impacted the granting of rights-of-way across reservation lands. See Neb. Pub. Power Dist. v. 100.95 Acres of Land, 719 F.2d 956, 958-59 (8th Cir. 1983). Our industrializing nation was expanding westward, and Congress sought to alleviate this obstacle by passing the IRWA, which authorizes the Secretary to grant "rights-of-way for all purposes, subject to such conditions as he may prescribe, over and across any lands now or hereafter held in trust by the United States for individual Indians or Indian tribes." 25 U.S.C. § 323.

In Taylor v. Anderson, the Supreme Court held that an ejectment action by an individual allottee who owns allotted land in fee does not fall within federal question jurisdiction; it is a federal statutory defense, not a federal common law claim. 234 U.S. 74, 75 (1914). By contrast, for nearly two centuries, the Supreme Court has recognized that Indian *tribes* have "unquestioned" land rights rooted in their status as "time immemorial lords of the soil they occupy." Cherokee Nation v. Georgia, 30 U.S. 1, 17 (1831). These rights "have been solemnly designated and secured to them by treaty and by laws of the United States." Id. at 28. The tribal right to exclusive possession of their lands is known as "Indian title," "aboriginal title," or the "right of occupancy." Id. at 48; see Johnson v. M'Intosh, 21 U.S. 543, 592 (1823); Mitchel v. United States, 34 U.S. (9 Pet.) 711, 746 (1835); Sims' Lessee v. Irvine, 3 U.S. (3 Dall.) 425, 452 (1799).

In Oneida Indian Nation of N.Y. v. Oneida Cnty., N.Y., 414 U.S. 661 (1974) (Oneida I), the Supreme Court upheld federal question jurisdiction over the Oneida Nation's claim of the right to possess some six million acres of land in two New York counties, confirmed by treaties with the United States in the late eighteenth century. The Court noted the "accepted doctrine in this Court that although fee title to the lands occupied by Indians when the colonists arrived became vested in the [discovering] sovereign . . . a right of occupancy in the Indian tribes was nevertheless recognized. That right, sometimes called Indian title and good against all but the

-13-

sovereign . . . . was extinguishable only by the United States." Id. at 667 (cleaned up).

"Given the nature and source of the possessory rights of Indian tribes, particularly when confirmed by treaty," the Court concluded in Oneida I, "it is plain that the [Oneida Nation's] complaint asserted a controversy arising under the Constitution, laws, or treaties of the United States within the meaning of both [28 U.S.C.] § 1331 and § 1362." Id. "Tribal rights were . . . entitled to the protection of federal law, and with respect to Indian title based on aboriginal possession, the power of Congress is supreme." Id. at 669 (cleaned up); see also Nw. Bands of Shoshone Indians v. United States, 324 U.S. 335, 338-39 (1945); United States v. Santa Fe Pac. R. Co., 314 U.S. 339, 345-47 (1941). In remanding for further federal court proceedings, the Supreme Court briefly addressed the governing law question:

> [A]s the court below recognized, state law does not apply to the Indians except so far as the United States has given its consent. There being no federal statute making the statutory or decisional law of the State of New York applicable to the [Oneida] reservations, the controlling law remained federal law; and, *absent federal statutory guidance, the governing rule of decision would be fashioned by the federal court in the mode of the common law*. Oneida I, 414 U.S. at 674 (emphasis added; cleaned up).

Important to our decision in this case, the Court in Oneida I carefully distinguished its prior decision in Taylor v. Anderson, explaining that cases by allottees like Taylor are different from cases in which a tribe brings an ejectment claim. "[T]he [Tribe's] right to possession itself is claimed to arise under federal law *in the first instance*" based on aboriginal Indian title that is "guaranteed by treaty . . . [and] has never been extinguished." 414 U.S. at 676 (emphasis added). By contrast, Taylor concerned:

-14-

lands allocated to individual Indians, not tribal rights to lands. . . . <u>Taylor</u> is more like those cases indicating that a controversy in respect to lands has never been regarded as presenting a Federal question merely because one of the parties to its has derived his title under an act of Congress. Once [fee] patent issues, the incidents of ownership are, for the most part, matters of local property law to be vindicated in local courts [which] is normally insufficient for 'arising under' jurisdiction.

<u>Id.</u> (quotation and citations omitted). Here, unlike <u>Taylor</u>, the Allottees have equitable ownership, not fee title; the United States has fee title and holds their lands in trust for their benefit. Thus, the Court's interpretation of <u>Taylor</u> does not resolve whether the Allottees have the federal common law claims they assert.

The Oneida Nation's possessory claims returned to the Supreme Court in <u>Oneida Cnty., N.Y. v. Oneida Indian Nation of N.Y.</u>, 470 U.S. 226 (1985) (<u>Oneida II</u>). A divided Court affirmed the Court of Appeals finding of liability under federal common law, rejecting the dissenters' contention that the Nation's tribal claims should be time-barred because they "waited 175 years before bringing suit to avoid a 1795 conveyance that the Tribe freely made, for a valuable consideration." <u>Id.</u> at 255 (Stevens, J., dissenting). As relevant to the issues on appeal, the Court in <u>Oneida II</u> noted that many prior cases had assumed that tribes have "a federal common-law right to sue to *enforce their aboriginal land rights*." <u>Id.</u> at 235 (emphasis added). The cornerstone principle providing tribes with a federal common law cause of action was "that Indian nations held 'aboriginal title' to lands they had inhabited from time immemorial." <u>Id.</u> at 233-34. This backdrop of "well-established principles" confirmed the conclusion in <u>Oneida I</u> that "the possessory right claimed by the Oneidas is a *federal* right to the lands at issue" and that tribes possessing aboriginal title could "maintain this action for violation of their possessory rights based on federal common law." <u>Id.</u> at 235-36.

The Allottees (and the United States as amicus) argue that federal common law provides them a cause of action for continuing trespass on their possessory interest in lands held in trust by the United States, relying primarily on the Supreme Court's opinions in Oneida I and Oneida II and disregarding our contrary tentative conclusion in Chase I. Without question, *if there is a claim* it is governed by federal law; the court, whether federal or state, will need to determine, as in Oneida I, whether the governing rule of decision should be fashioned "in the mode" of federal common law. Oneida I, 414 U.S. at 674; see, e.g., United States v. Kimbell Foods, Inc., 440 U.S. 715, 727-40 (1979) (fashioning federal common law in context of federal lending program liens). But in recognizing a federal common law cause of action by a tribe in Oneida I, the Supreme Court stressed "the nature and source of the possessory rights of Indian tribes to their aboriginal lands, particularly when confirmed by treaty . . . ." 414 U.S. at 667; see Oneida II, 470 U.S. at 236. The Allottees concede that their individual possessory interests are not based on individual claims of aboriginal or Indian title. Their equitable claims of possessory interests as Allottees are based on federal statutes from the Allotment and Post-Allotment eras, including the IRWA.

As we explained in Chase I, the key issue is not whether federal law supplies a cause of action for trespass on individual Indian allotments, but whether there is a common law or statutory trespass claim the Allottees have standing to assert. We reiterate that "this case is distinguishable from Oneida in two significant respects -- the Allottees are not a tribe, like the Oneida Nation, and the alleged source of their ownership interests was federal statutory allotments, not necessarily Indian title." Chase I, 12 F.4th at 872. The Allottees characterize these contrasts as "artificial distinctions." But they are long-recognized, critical distinctions in Indian law. The Supreme Court in Taylor, Oneida I, and Oneida II did not distinguish tribal and individual Indian possessory land claims based on the land's ownership. The distinction that mattered was whether the claimed possessory right is based on aboriginal title or a federal statutory grant. We recognized the importance of this distinction in Wolfchild v. Redwood County, where we concluded that, lacking a

-16-

claim of aboriginal title, individual Indians "failed to state a claim under the federal common law as set forth in the *Oneida* progeny." 824 F.3d 761, 768 (8th Cir.), cert. denied, 580 U.S. 980 (2016). Allegations of possession or ownership under a United States patent are "normally insufficient" for federal jurisdiction, whereas federal common law claims arise when a tribe "asserts a present right to possession based on their aboriginal right of occupancy which was not terminable except by act of the United States." Id., quoting Oneida I, 414 U.S. at 676-77 (cleaned up). Wolfchild has "direct bearing on whether the Allottees have the federal common law rights they assert, or whether they must instead find an alternative basis for their claims under federal law." Chase I, 12 F.4th at 874 (cleaned up).

The Allottees contend that they possess the same trespass claim under federal common law the United States has asserted in its Tesoro counterclaims, relying on Poafpybitty v. Skelly Oil Co., 390 U.S. 365 (1968). There, the Supreme Court held that individual Indians holding restricted trust allotments issued under the Dawes Act have standing to sue to enforce an oil and gas lease approved by the Department of the Interior for use on the land because the "dual purpose of the allotment system would be frustrated unless both the Indian and the United States were empowered to seek judicial relief to protect the allotment." Id. at 369.

We agree with the district court that Poafpybitty does not control this case. In Poafpybitty, both the United States and the individual Indian landowners had standing to assert a claim under a federally approved lease. Here, the issue is whether the Allottees *have a trespass claim* under federal law. The Tribe's right under the Oneida cases to assert a trespass claim under federal common law based on its aboriginal title does not transfer to individual allottees suing to protect equitable possessory interests conveyed by federal statutes. As the district court explained:

> [I]f an action involving Indian land can be maintained by the protected Indians or Indian tribes and by the United States on their behalf, then it

-17-

is settled law that the right to assert the sovereign interests at issue is equally available to either plaintiff. . . . Poafpybitty represents that where Indians (either tribes or individuals) *and* the United States may bring the same claim, then either may bring a lawsuit (subject to certain limitations). . . . Poafpybitty does not permit the Allottees to piggyback on the United States' alleged federal common law claim if the Allottees themselves do not have the independent right to bring the claim.

Chase, 686 F. Supp. 3d at 868. Poafpybitty may be an important precedent if the United States continues to oppose the Allottees' efforts to assert competing statutory claims for relief under the IRWA in this case or in Tesoro. But we remain unaware of any Supreme Court or circuit court decision that affords allottees with equitable possessory interest to tribal lands held in trust an individual cause of action for trespass *under federal common law*.[7]

We again conclude that the Allottees' position as equitable owners of tribal land held in trust by the United States does not provide standing to bring this federal common law trespass cause of action. This does not leave the Allottees with a right without a remedy. Their alleged injuries are redressable in federal court applying federal law, and the United States as trustee has asserted authority to pursue the claims for the Allottees' benefit in Tesoro. See 25 C.F.R. §§ 169.402, 169.407, 169.410, 169.413. Absent a statutory provision from Congress explicitly providing

---

[7]Allottees' continued reliance on United States v. Milner, 583 F.3d 1174 (9th Cir. 2009), and Nahno-Lopez v. Houser, 625 F.3d 1279 (10th Cir. 2010), fails to address our evaluation of these cases in Chase I, 12 F.4th at 874 n.6. Allottees assert a circuit split will arise if we find no common law claim available. Not so. The Tenth Circuit's decision in Davilla *assumed* the common law right existed based on the parties' agreement. The court stated it was "unclear whether we have ever formally recognized a federal claim for trespass on an Indian allotment, or simply assumed such a claim's existence." 913 F.3d 959, 965 & n.2 (citing Nahno-Lopez). The court did not consider whether individual Indians' claims differ from tribal claims based on their lack of aboriginal title.

-18-

the Allottees a common law cause of action, when the United States and the BIA failed to take action to pursue federal statutory claims the Allottees have not pursued in this case, the district court did not err in deciding the federal common law issue consistent with our tentative analysis in Chase I. Courts do not have "authority to formulate federal common law by virtue of a grant of jurisdiction," "nor does the existence of congressional authority under [Article] I mean that federal courts are free to develop a common law to govern those areas until Congress acts." Radcliff, 451 U.S. at 640-41. The Supreme Court's silence on the ability of individual allottees to assert federal common law claims -- implicitly echoed by the BIA in defending its federal common law counterclaims in Tesoro -- is deafening. Absent previously recognized common law rights, we decline to create the extended federal common law cause of action the Allottees urge.

Allottees assert that trust title and aboriginal title equally produce a common law right for both tribes and individual Indians. But they extend cited precedents beyond their tenable reach. We agree that "trust allotments retain 'during the trust period a distinctively Indian character, being devoted to Indian occupancy under the limitations imposed by federal legislation[.]'" United States v. Ramsey, 271 U.S. 467, 470 (1926) (quotation omitted). But Indian occupancy under federal statutory limitations is not the equivalent of aboriginal title.

Finally, the Allottees argue that the BIA's regulations under the IRWA confirm their ability to assert the same federal common law trespass claims as the United States. We disagree. In Chase I, we found "no express private right of action in the Indian Right-of-Way Act and the Supreme Court does not look with favor on implied rights of action." 12 F.4th at 877. The IRWA contains no express private right of action, nor does it include the kind of "rights-creating" language that would suggest an implied private remedy. See Wolfchild, 824 F.3d at 769 (finding no express private remedy for analogous 1863 Act). Rather, the Act vests the Secretary with discretionary authority ("[r]ights-of-way . . . may be granted") that does not support

-19-

the existence of a private remedy.  Id.  Granting jurisdiction is insufficient to establish a cause of action.  See Touche Ross & Co. v. Redington, 442 U.S. 560, 577 (1979).

The Secretary's IRWA regulations include provisions that may permit the BIA and the Allottees to seek "additional remedies available under applicable law" against holdover right-of-way grantees such as Andeavor.  See 25 C.F.R. §§ 169.410, 169.413.  Those are open issues that may need to be resolved as this case and/or Tesoro proceed to a decision on the merits.  But those would be federal statutory remedies.  "The vesting of jurisdiction in the federal courts does not in and of itself give rise to" a federal common law claim.  Radcliff, 451 U.S. at 640-41.

**B. Unjust Enrichment.**  The district court dismissed the Allottees' claims for unjust enrichment because they depend on the validity of their common law trespass claims.  On appeal, Allottees argue that, when a trespass occurs, federal common law provides a cause of action independent from the success of their trespass claim.  The Appellees cite no case recognizing a federal common law claim for unjust enrichment; they cite only a single decision from the Supreme Court of North Dakota discussing the elements of a *state law* claim.  Because we conclude the Allottees have no federal common law trespass claim, we likewise affirm dismissal of this claim.

Allottees assert that Oneida II demonstrates that a trespass action can give rise to additional independent common law claims other than trespass because it noted that "Indians have a common-law right of action for an accounting . . . against trespassers on their land."  470 U.S. at 235-36, citing  Santa Fe Pac. R.R. Co., 314 U.S. 339, 344 (1941).  However, the right to an accounting is a remedy, not a cause of action.  See Santa Fe, 314 U.S. at 359-60.  In Heckman v. United States, 224 U.S. 413 (1912), the Supreme Court held that, "when the United States itself undertakes to represent the allottees of lands under restriction, and brings suit . . . such action necessarily precludes the prosecution by the allottees of any other suit for a similar purpose, relating to the same property."  Id. at 446.  The same principle should apply

when the lands at issue are held in trust and the United States is seeking damages on their behalf in its Tesoro counterclaims.

**C. Breach of the Expired Easement Agreement.** The district court dismissed Allottees' common law breach of easement claim, concluding the United States is an indispensable required party in whose absence the action could not be maintained. Chase, 686 F. Supp. 3d at 875-76. We conclude the court did not err in agreeing with our conclusion in Chase I: "In a breach-of-contract action involving a right-of-way over individual trust allotments, the United States, as grantor, is an indispensable party." 12 F.4th at 878.

"Rule 19(a) [of the Federal Rules of Civil Procedure] defines 'required party,' and Rule 19(b) provides factors to consider to determine whether dismissal is required when joinder of such a party cannot feasibly be accomplished." Two Shields v. Wilkinson, 790 F.3d 791, 794 (8th Cir. 2015). (The original Rule 19(b) used the word "indispensable." Fed. R. Civ. P. 19(b), advisory committee's note to 1966 amendment.) We review conclusions of law underlying a district court's Rule 19(a) determination *de novo* and its Rule 19(b) decision to dismiss for failure to join an indispensable party for abuse of discretion. Id. at 794-95, 797-98. A court "abuse[s] its discretion if it base[s] its ruling on an erroneous view of the law." In re Cotter Corp., (N.S.L.), 22 F.4th 788, 793 (8th Cir. 2022), quoting Cooter & Gell v. Hartmarx Corp., 496 U.S. 384, 405 (1990).

Allottees' breach of easement claim is governed by federal law, as Andeavor's rights-of-way were granted under a process almost entirely controlled, regulated, and protected under federal law, with the United States a party to the agreement. See Kodiak Oil & Gas (USA) Inc. v. Burr, 932 F.3d 1125, 1134, 1136 (8th Cir. 2019); Comstock Oil & Gas Inc. v. Alabama & Coushatta Indian Tribes of Texas, 261 F.3d 567, 574-75 (5th Cir. 2001); 25 U.S.C. §§ 323-328, 345; 25 C.F.R. § 169.410-413. The United States granted rights-of-way that Andeavor enjoyed until its easement

expired in 2013. The 1995 Easement Agreement incorporated BIA regulations under 25 C.F.R. § 169.125(c)(5)(ix), requiring Andeavor to "[r]estore the land to its original condition, to the maximum extent reasonably possible, upon cancellation or termination of the right-of-way, or reclaim the land if agreed to by the landowners." When the rights-of-way easement expired in 2013, Andeavor continued operations and did not restore the land.

The Allottees argue they are entitled to bring suit for the alleged breach as third-party beneficiaries whose consent was required to create a valid right-of-way. Cf. United States v. Sioux Nation of Indians, 448 U.S. 371, 408-16 (1980). Andeavor does not meaningfully dispute this contention, except to note that the contract lacks a clear expression of intent to confer third-party beneficiary status. See Syngenta Seeds, Inc. v. Bunge N. Am., Inc., 773 F.3d 58, 64 (8th Cir. 2014) ("A nonparty becomes legally entitled to a benefit promised in a contract . . . only if the contracting parties so intend."). We will assume without deciding that the Allottees may sue for breach as third-party beneficiaries of the agreement. But that does not resolve the issue. Consistent with Chase I, the district court concluded that the United States is a required party for Allottees' breach of easement claim.

"[D]etermining whether a non-party is an indispensable party is a two-step process. First, the court must determine whether the non-joined party is a 'required' (necessary) party under Rule 19(a)(1)." Sorenson v. Sorenson, 64 F.4th 969, 975 (8th Cir. 2023). Under Rule 19(a)(1), a party is required to be joined if:

> **(A)** in that person's absence, the court cannot accord complete relief among existing parties; or

> **(B)** that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may:

**(i)** as a practical matter impair or impede the person's ability to protect the interest; or

**(ii)** leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest.

If the United States "is necessary under Rule 19(a)(1), the court must [then] conduct a multi-factor analysis under Rule 19(b) to 'determine whether, in equity and good conscience,' the action should proceed or be dismissed." Id., quoting Rule 19(b). The factors to be considered under Rule 19(b)include:

**(1)** the extent to which a judgment rendered in the person's absence might prejudice that person or the existing parties;

**(2)** the extent to which any prejudice could be lessened or avoided by:

**(A)** protective provisions in the judgment;

**(B)** shaping the relief; or

**(C)** other measures;

**(3)** whether a judgment rendered in the person's absence would be adequate; and

**(4)** whether the plaintiff would have an adequate remedy if the action were dismissed for nonjoinder.

The Allottees argue the United States is not a required party because the alleged breach does not threaten any interest held by the government, whereas their suit advances the United States' interests by promoting compliance with federal regulations and enforcing the terms of an agreement to which the government was a party, citing Sandobal v. Armour & Co., 429 F.2d 249, 257-58 (8th Cir. 1970). We

disagree. First, the United States as trustee holding legal title to the allotted lands and grantor of the rights-of-way clearly has interests in this litigation that are almost certain to be impeded if it is excluded from this action. Under 25 C.F.R. § 169.410, when a right-of-way expires and is in holdover status, the BIA is the only identified entity empowered to "take action to recover possession on behalf of the Indian landowners, and pursue any additional remedies available under applicable law." In Tesoro, it has done just that. Permitting this separate action to continue undercuts the BIA's authority to "take action." § 169.410. Further, the district court has stayed the United States' trespass action in Tesoro pending resolution of this case. The United States' interest in resolving this issue on terms it considers consistent with the IRWA has been stalled and, should this action continue without its participation, perhaps stymied. See Nichols v. Rysavy, 809 F.2d 1317, 1331-34 (8th Cir. 1987); Two Shields, 790 F.3d at 796.

Second, "there can be no binding adjudication of a person's rights in the absence of that person," and permitting two unique claims for breach of agreement in Allottees' suit and trespass in Tesoro exposes all parties to potentially disconnected and incongruent outcomes. Provident Tradesmens Bank & Trust Co. v. Patterson, 390 U.S. 102, 122 (1968); Two Shields, 790 F.3d at 796. The United States would not be bound, administratively or judicially, by any judgment in an action to which it was not a party, so its exclusion would raise a "substantial risk" of Andeavor facing multiple inconsistent obligations and remedies. See Rule 19(a)(1)(B)(ii).

Prior decisions support the district court's conclusion that the United States is an indispensable party. In Minnesota v. United States, the Supreme Court considered an action to condemn and take title to allottee trust lands. 305 U.S. 382, 383-85 (1939). The Court concluded that the United States was an indispensable party and "[i]n its capacity as trustee for the Indians it is necessarily interested in the outcome of the suit." Id. at 388. Because the United States possesses "substantial powers and responsibilities with relation to the land," the Court emphasized that trust allotments

-24-

are a "stronger case" for finding the United States is "an indispensable party to any suit to establish or acquire an interest in the lands" in order to ensure "effective relief." Id. at 386 n.1; cf. Cheyenne River Sioux Tribe of Indians v. United States, 338 F.2d 906, 909 (8th Cir. 1964) ("generally the Government is the indispensable party in an action which involves alienation or condemnation of Indian property.")

In Nichols, 809 F.2d at 1320, we dismissed Indian allottee claims for failure to join the United States under Rule 19. The allottees were descendants of Indians who had received "forced fee patents" -- land removed from trust without their ancestors' consent -- who lost or transferred fee title after receiving the patents. The descendants sued the United States, South Dakota, a county, and private parties to reclaim possession, restore trust status, and recover damages. Id. at 1321-22. We dismissed the claims against the United States as time-barred, id. at 1331, and then dismissed the suit under Rule 19, concluding the United States "as the allotting agent, is the appropriate defendant in suits involving the right to an allotment," id. at 1333 (quotation omitted). We noted the "claims [had] far reaching social, economic, and political ramifications," with expansive implications for the federal government. Id. As in Nichols, here the United States created rights-of-way across allotted Indian lands now held in trust; restrictions on its ability to manage litigation regarding violation of the government's easement agreement would undermine its broad regulatory responsibilities, particularly where the tracts are highly fractionated and unanimous allottee agreement is difficult. It "seems absurd to argue" that the BIA is charged with gathering consent from multiple Indian allottees, negotiating initial and renewal easement terms with grantees, and acting to protect the interests of numerous allottees, "and then assert that the United States is not indispensable." Id. at 1333. The presence of the United States in this type suit is required.

Allottees contend that our precedents and those from other circuits establish that the United States is not a necessary party when individual Indian allottees bring suits to protect their land. It is true that we have "reject[ed] the notion that the United

-25-

States is an indispensable party to every case involving a dispute over Indian lands." Spirit Lake Tribe v. North Dakota, 262 F.3d 732, 747 n.6 (8th Cir. 2001), abrogated on other grounds by Wilkins v. United States, 598 U.S. 152 (2023). In Bird Bear v. McLean County, 513 F.2d 190 (8th Cir. 1975), for example, successors to allotted land held in trust on the Fort Berthold Reservation sued the County as trust patentees (not holders of Indian title) for trespass for maintaining a road on a portion of the allotment without a required government approval. On appeal, the allottees, having lost in the district court, raised an argument "not raised in the district court" -- that the United States was an indispensable non-party to the suit. We summarily rejected the contention in a footnote, noting there was no risk of "multiple lawsuits or judgments" and the United States had declined an invitation to participate as amicus. Id. at 191-92 n.6. But in none of the cases Appellees cite was the United States the sole party to a contract that granted the rights-of-way at issue and retained statutory responsibility for administering them. The Allottees again rely on Poafpybitty, but in that case individual Indians, not the United States, were parties to the lease on allotted lands at issue. 390 U.S. at 372 ("Although the approval of the Secretary is required, he is not the lessor and he cannot grant the lease on his own authority."). Here, the United States granted the rights-of-way, bears statutory responsibility for monitoring and extending them, and has a statutory duty to protect the Allottees' interests in lands held in trust.

Though it is a required party, the United States cannot be joined in the suit. United States v. Sherwood, 312 U.S. 584, 586 (1941) ("The United States, as sovereign, is immune from suit save as it consents to be sued."). "The United States enjoys sovereign immunity . . . and can decide itself when and where it wants to intervene." Two Shields, 790 F.3d at 799. Despite our invitation to help resolve the issues in Chase I, the United States chose not to intervene, but it has not affirmatively waived its immunity from suit.

Finally, Allottees argue that "equity and good conscience" require this contract claim to proceed even in the United States' absence as a required party. Applying the multi-factor test under Rule 19(b) for determining whether the action should proceed among existing parties, we conclude the district court did not abuse its discretion in dismissing the Allottees' claims. The multiple breach of easement agreement claims implicate multiple layers of federal government interest in this matter. "In the specific context of an immune sovereign entity that is a required party not amenable to suit, the Supreme Court has explained that the action must be dismissed if the claims of sovereign immunity are not frivolous and 'there is a potential for injury to the interests of the absent sovereign.'" Two Shields, 790 F.3d at 798, quoting Republic of the Philippines v. Pimentel, 553 U.S. 851, 867 (2008). In addition, the BIA's regulatory actions to recover damages and prevent further trespass on the trust lands and the United States' counterclaims in Tesoro likely provide the Allottees with an adequate remedy based on the outcome of that suit. Carefully weighing these factors, we affirm dismissal of Allottees' breach of easement claim.

## IV. The Tesoro Intervention and Consolidation Issues.

The Appellees argue the district court erred in denying their motion to intervene in Tesoro, either as of right or permissively, and in not granting their request to consolidate the two cases. Intervention is governed by Rule 24.

**A. Intervention as of Right.** The district court denied Allottees' motion to intervene as of right in Tesoro. Chase, 686 F. Supp. 3d at 877-78. Rule 24(a) entitles a party to intervene if (1) a federal statute gives the party "an unconditional right to intervene" or (2) the party "claims an interest relating to the property . . . that is the subject of the action, and . . . disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest." The Allottees do not claim a statutory right to intervene. The issue is whether the United States in Tesoro will adequately represent

their interests, an issue we review *de novo*. See North Dakota ex rel. Stenehjem v. United States, 787 F.3d 918, 920 (8th Cir. 2015) (Stenehjem).

We apply a "tripartite test" to determine whether intervention as of right is appropriate: "1) the party must have a recognized interest in the subject matter of the litigation; 2) that interest must be one that might be impaired by the disposition of the litigation; and 3) the interest must not be adequately protected by the existing parties." Mille Lacs Band of Chippewa Indians v. Minnesota, 989 F.2d 994, 997 (8th Cir. 1993) (Mille Lacs). The district court assumed that the Allottees possess a sufficient interest relating to the Tesoro litigation that would be impaired or impeded by the disposition of that case on the merits, but concluded the Allottees fail to demonstrate that the United States does not "adequately represent their interest." Chase, 686 F. Supp. 3d at 878.

In Heckman, the United States sued to cancel conveyances of allotted lands made by members of the Cherokee Nation. 224 U.S. at 425. The Supreme Court held that "the United States, representing the owners of restricted lands, is entitled to bring a suit of this character" and rejected the allottees' claim that they should be permitted to bring their own action:

> There can be no more complete representation than that on the part of the United States in acting on behalf of these dependents, whom Congress, with respect to the restricted lands, has not yet released from tutelage. Its efficacy does not depend upon the Indians' acquiescence. It does not rest upon convention, nor is it circumscribed by rules which govern private relations. It is a representation which traces its source to the plenary control of Congress in legislating for the protection of the Indians under its care, and it recognizes no limitations that are inconsistent with the discharge of the national duty.

-28-

Id. at 444-45. For claims of intervention, there is a "presumption of adequate representation by the United States [that] can be overcome only by a strong showing of inadequate representation." Stenehjem, 787 F.3d at 922 (quotation omitted).

> Although the burden of showing inadequate representation usually is minimal, when one of the parties is an arm or agency of the government, and the case concerns a matter of sovereign interest, the bar is raised, because in such cases the government is presumed to represent the interests of all its citizens. The government represents the interests of a movant to the extent his interests coincide with the public interest.

Id. at 921 (quotations and citations omitted). The Allottees argue the presumption of adequate representation should not apply because their interests "differ from the United States" -- the government shares their interest in the outcome of Tesoro, but "for very different reasons." We disagree. "Although [the Allottees] may have different reasons than the government for seeking to defeat [Andeavor's] claims" in this case and in Tesoro, "the interests of the [Allottees] and the United States are aligned." Stenehjem, 787 F.3d at 921-22. The Allottees further argue the resolution they seek through litigation diverges significantly from the government's attempts to settle, and a "potential conflict of this sort is sufficient to satisfy [their] minimal burden of showing that representation of their interests by the existing parties may be inadequate." Mille Lacs, 989 F.2d at 1001. However, the divergence in interests in Mille Lacs concerned fundamentally different forms of relief, not merely differing degrees of the same remedy. Here, the Allottees have not identified any concrete divergence between their desired outcome and what the government is pursuing by litigation or settlement.

The United States' representation, "which traces its source to the plenary control of Congress in legislating for the protection of the Indians under its care," safeguards Allottees' interests because it "recognizes no limitations that are inconsistent with the discharge of the national duty." Heckman, 224 U.S. at 444-45.

"Absent . . . [a] clear dereliction of duty, . . . the proposed intervenor cannot rebut the presumption of representation by merely disagreeing with the litigation strategy or objectives of the party representing him." Chiglo v. City of Preston, 104 F.3d 185, 188 (8th Cir. 1997). We conclude the district court did not err in denying the Appellees intervention as of right.

**B. Permissive Intervention.** The district court also denied the Appellees permissive intervention under Rule 24(b), which provides that a "court may permit anyone to intervene" if they are either "given a conditional right to intervene by a federal statute" or if they have "a claim or defense that shares with the main action a common question of law or fact." See Chase, 686 F. Supp. 3d at 878-79. The decision to deny permissive intervention is "wholly discretionary," with the "principal consideration" being whether the proposed intervention would "unduly delay or prejudice the adjudication of the parties' rights." S.D. ex rel. Barnett v. U.S. Dep't of Interior, 317 F.3d 783, 787 (8th Cir. 2003) (Barnett). "Accordingly, we grant great deference to the district court's decision to deny a Rule 24(b) motion, reviewing it only for a clear abuse of discretion." Id. (citations omitted).

The Allottees argue that in cases where the United States acts as a representative for Indian tribes and may bind them to a judgment, "it is obvious that the Indians Tribes, at a minimum, satisfy the standards for permissive intervention." Arizona v. California, 460 U.S. 605, 614 (1983). However, the issue here differs from Arizona because the Allottees are not a tribe and do not have the ability to bring the common law cause of action they now seek to join. Moreover, even if their cited authority "probably would have persuaded us to grant the motion if we were . . . ruling on the motion in the first instance, we cannot say that the district court clearly abused its discretion in this case by not granting the motion." Barnett, 317 F.3d at 787, citing Arizona, 460 U.S. 605, 614-15.

"Reversal of a decision denying permissive intervention is extremely rare, bordering on nonexistent."  Barnett, 317 F.3d at 787 (citations omitted).  In its discretion, the district court provided multiple reasons for denying Allottees' request -- intervention in Tesoro would unduly delay "an already prolonged case ripe for decision" with new filings, briefs, and motions, Chase, 686 F. Supp. 3d at 879; the Allottees were already adequately represented, which is a legitimate consideration, see Barnett, 317 F.3d at 787; and the claim brought by the United States in Tesoro is for trespass under federal common law, a cause of action Allottees lack standing to pursue. The district court did not abuse its substantial discretion in denying permissive intervention.  "[W]hen the United States itself undertakes to represent the allottees of lands under restriction, and brings suit . . . such action necessarily precludes the prosecution by the allottees of any other suit for a similar purpose, relating to the same property."  Heckman, 224 U.S. at 446.

**C. The Consolidation Issue.**  On March 30, 2020, counsel for the Allottees filed a Motion To Consolidate Pending Class Actions in the district court, arguing that a "substantially similar class action" was filed in the district court (Tesoro), the two putative class actions "involve common, if not identical, questions of law and fact," and consolidation "pursuant to Federal Rule of Civil Procedure 42(a)" was appropriate "because consolidation would further judicial efficiency, eliminate or reduce repetition and confusion, would be more convenient to the parties and non-party witnesses, and will not prejudice Defendants."  The district court granted Andeavor's motion to dismiss a few days later, the Allottees appealed, and we remanded the case in Chase I.  In September 2021 the district court ordered the parties "to brief whether joinder of this matter with Tesoro . . . is appropriate and warranted."  The Allottees supported and Andeavor opposed intervention or consolidation, and counsel argued the issue at a telephonic status conference on June 8, 2023.  The district court ruled:  "I'm not going to have [counsel for Andeavor] reinvent the wheel.  He's already filed a motion to dismiss that I'll consider based upon the common law issue."  In the Order being appealed, the court "denie[d] the

Allottees' motion to intervene in the <u>Tesoro</u> lawsuit," discussing intervention as of right under Rule 24(a) and permissive intervention under Rule 24(b). <u>Chase</u>, 686 F. Supp. 3d at 877-79. On appeal, the Allottees argue "the district court abused its discretion and prevented meaningful appellate review by failing to address consolidation."

Andeavor briefs this issue as though it turns on Rule 24(b) standards for permissive intervention. That is an "up or down" issue -- you're in the suit or you're not. None of the appeal briefs cite the *controlling* federal rule, Rule 42, which is titled "Consolidation; Separate Trials" and was the stated basis for the Appellees' initial Motion to Consolidate in March 2020. Rule 42(a) provides:

> (a) **Consolidation.** If actions before the court involve a common question of law or fact, the court *may*:
>
> **(1)** join for hearing or trial any or all matter at issue in the actions;
>
> **(2)** consolidate the actions; or
>
> **(3)** issue any other orders to avoid unnecessary cost or delay.

(emphasis added.) When actions involving a common question of fact or law are pending, Rule 42(a) grants broad discretion to "order all the actions consolidated [or] make such orders concerning proceedings therein as may tend to avoid unnecessary costs or delays." <u>See</u> <u>Enterprise Bank v. Saettele</u>, 21 F.3d 233, 235 (8th Cir. 1994).

This is the second interlocutory appeal in this case. Another panel is scheduled to hear argument in an interlocutory appeal of the district court's grant of a preliminary injunction in the separate <u>Tesoro</u> action. After seven years of litigation, neither case is even close to a final resolution of the merits unless firm case management actions are taken by the district court. The common issues are apparent.

-32-

The need "to avoid unnecessary cost or delay" and the prospect of additional waste of judicial resources are likewise apparent.

On the merits, the two cases raise important and difficult common or overlapping issues of federal Indian law, with little if any controlling precedent. In Chase I, we noted the IRWA vests the Secretary of the Interior with discretionary authority ("[r]ights-of-way . . . may be granted") but contains no express private right of action, nor does it include the kind of "rights-creating" language that would suggest an implied private remedy. The Supreme Court does not look with favor on implied rights of action, and statutory language framed in such discretionary terms does not support the existence of a private remedy. Chase I, 12 F.4th at 877; see Wolfchild, 824 F.3d at 769. Yet the United States has asserted and the Allottees have alleged claims based on an implied right of action.

The United States counterclaims in Tesoro are based on an IRWA regulation that permits the BIA to seek "available remedies under applicable law" against holdover right-of-way grantees such as Andeavor. 25 C.F.R. § 169.410. The Allottees will doubtless argue that another IRWA regulation permitting them to "pursue any available remedies under applicable law," 25 C.F.R. § 169.413, affords them the same *statutory* trespass action (which they have alleged but not pursued in either case). Section 169.410 makes no mention of Indian landowners' ability to pursue trespass remedies on their own behalf, and the position taken by the United States in Tesoro suggests that it believes the BIA has *exclusive* statutory authority to obtain relief from a holdover grantee for the benefit of beneficial owners of trust land. Andeavor's apparent position further complicates the legal landscape -- it argues in Tesoro (i) that the BIA's vacatur of the Second Notice violated the APA; (ii) that its compliance with the Second Notice satisfied any valid claims of holdover breach; and perhaps (iii) that any further attempt to recover based on the Secretary's regulations goes beyond the authority Congress delegated in the IRWA.

These are complex federal statutory issues that may need to be resolved in a decision on the merits of this case and/or <u>Tesoro</u>. Moreover, once the court determines who has a cause of action to obtain relief from a holdover grantee -- Andeavor has more or less conceded that it has an obligation to pay for its holdover use of the pipeline -- the proper damage and injunctive relief must be determined, which is the primary reason settlement talks have failed and may be difficult and time-consuming to litigate. The Allottees' interests as equitable owners of possessory rights to tribal land held in trust by the United States may well be redressable by the trespass counterclaims asserted by the United States in <u>Tesoro</u> as trustee representing the Allottees. <u>See</u> 25 C.F.R. §§ 169.402, 169.407, 169.410, 169.413. But the Allottees have expressed considerable frustration and disagreement with actions taken by the United States on their behalf. The decision in <u>Poafpybitty</u> that the United States' "power to sue [does not] affect the rights of the individual Indian" to bring the same claim, 390 U.S. at 370, suggests that the Allottees may have statutory standing to argue for additional remedies because the United States is not adequately representing their interests.

We review these potential complexities in resolving the merits of this dispute not to predict what the parties will argue and what the district court will need to decide, but to explain why we conclude that, in addition to affirming the district court's decision to dismiss the Allottees' common law claims, we will remand the case to determine whether these multiple common questions of fact and law warrant discretionary relief under Rule 42(a). With seven years experience with the issues and the parties, the district court is in a far better position to move this dispute to final resolution than we are.

GRASZ, Circuit Judge, dissenting in part.

I respectfully dissent from the court's judgment affirming the dismissal of the Allottees' trespass cause of action for lack of standing.

-34-

The Supreme Court has recognized "that ***Indians*** have a federal common-law right to sue to enforce their aboriginal land rights." Oneida II, 470 U.S. at 235 (emphasis added). But based on its interpretation of the Oneida cases and other precedent, today the court decides the Allottees do not have standing to assert a trespass claim under federal common law because, in its view, the Supreme Court meant "Indian tribes" when it said "Indians." I disagree. Because precedent does not require it, I would not deprive the individual Indians, to whom Congress allotted Indian land held in trust by the United States, the ability to enforce their property rights.

In Oneida II, the Supreme Court explained "[n]umerous" prior decisions, including Fellows v. Blacksmith, 60 U.S. 366 (1857), "recognized at least implicitly that ***Indians*** have a federal common-law right to sue to enforce their aboriginal land rights." 470 U.S. at 235 (emphasis added); see also id. n.6. Importantly, Fellows involved the estate of a Tonawanda Indian successfully bringing a trespass action against two individuals who had dispossessed him of a certain piece of land located on a reservation. 60 U.S. at 367. This suggests that when the Supreme Court in Oneida II said "Indians" had a federal common law right to sue to enforce their aboriginal land rights, it meant both tribes ***and individual tribe members***.[8] 470 U.S. at 235 (emphasis added).

The court reaches the opposite conclusion today in part by observing that in Oneida I, the Supreme Court distinguished its prior decision in Taylor because "cases by allottees like Taylor are different from cases in which a tribe brings an ejectment claim" in that the Tribe's right to possession arose based on "aboriginal Indian title"

_____

[8]Fellows is not controlling as it is unclear whether the trespass claim was brought under federal or state law. See Fellows, 60 U.S. at 366–67 (noting the case was brought in New York state courts). Nonetheless, it is meaningful when deciding what the Supreme Court in Oneida II meant when it said its case law implicitly recognized "Indians" had a federal common law right to sue. 470 U.S. at 235.

-35-

secured by treaty. Ante, at 14. But as discussed above, the significance of this distinction to the issue of whether a federal common law claim exists for individual tribe members is questionable.

Regardless, another distinguishing fact between Taylor and Oneida I is more significant — the Indian land at issue has been continuously controlled by the federal government. In Taylor, the land had already been transformed from federal land to privately-owned land and was, thus, rightly subject to state law. See Taylor, 234 U.S. at 74; Oneida I, 414 U.S. at 676–77 (explaining that in Taylor individual patents had issued and thus "the incidents of ownership" were mostly a "matter[] of local property law to be vindicated in local courts"). In Oneida I, by contrast, the land remained under federal control continuously and, therefore, federal law controlled. 414 U.S. at 676. As Justice Rehnquist explained in his Oneida I concurrence, "[i]n contrast to the typical instance in which the Federal Government conveys land to a private entity, the Government, by transferring land rights to Indian tribes, *has not placed the land beyond federal supervision*." 414 U.S. at 682, 684 (Rehnquist, J., concurring) (emphasis added). Given that federal law governed this land, "absent federal statutory guidance, the governing rule of decision would be fashioned by the federal court in the mode of the common law." Id. at 674. Thus, while the parties in Taylor had to resolve their claims in state court (because there was no federal jurisdiction), the "Oneidas c[ould] maintain [an] action for violation of their possessory rights based on federal common law" in federal court. Oneida II, 470 U.S. at 236.

Another case decided between the Oneida decisions underscores that a federal common law claim exists when there has been continuous federal control over Indian land. Indeed, in Wilson v. Omaha Indian Tribe, the Supreme Court applied federal law to claims brought by a tribe over the boundaries of its reservation following shifts in the Missouri River's course. 442 U.S. 653, 657–58, 670–71 (1979). The parties disputed whether federal or state law governed the suit, given the general principles that the mere origination of title to land in the United States did not mean federal

-36-

common law governed the suit.  Id. at 669–70.  The Supreme Court held federal law applied based largely on the United States's continued ownership of the land.  Id. at 670–71.  It noted "where the Government has never parted with title and its interest in the property continues, the Indians' right to the property depends on federal law, 'wholly apart from the application of state law principles which normally and separately protect a valid right of possession.'"  Id. at 670 (quoting Oneida I, 414 U.S. at 677).  The Supreme Court reasoned that the claims at issue were distinguishable from those brought by grantees whose lands were not held in trust by the United States, emphasizing "[t]his is not a case where the United States has patented or otherwise granted land to private owners in a manner that terminates its interest and subjects the grantees' incidents of ownership to determination by the applicable state law."  Id. at 671.  While the Court noted the Tribe's possessory interest was based on aboriginal title, id. at 670, its central focus was the United States's continued ownership of the land, which created a federal common law claim, id. at 670–71.

Here, as in Oneida and Wilson, the Indian land has never left the ownership of the United States and is not subject to state law.  Thus, I would conclude the Allottees have standing to bring a trespass claim under federal common law.

_____